**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MICHAEL WILKINS and KENNETH
MILLS, on behalf of himself and others
similarly situated,

                Plaintiff,

     v.

HSBC BANK NEVADA, N.A. and HSBC
CARD SERVICES, INC.,

                Defendants.

No.  1:14-cv-190

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................... 1

II.  STATEMENT OF THE FACTS ................................................................ 2

    A.  The TCPA Claims ............................................................................ 2

    B.  Plaintiffs Thoroughly Investigated the TCPA Claims ............................ 2

    C.  The Proposed Settlement ................................................................ 4

        1.  The Settlement Class.............................................................. 4

        2.  Monetary Relief for Settlement Class Members........................... 5

        3.  Class Release ....................................................................... 6

        4.  Attorneys' Fees and Class Representative Service Awards .......... 6

III.  CLASS NOTICE HAS BEEN DISSEMINATED ................................... 6

    A.  Direct Mail and Email Notice .................................................... 6

    B.  Published Notice ............................................................................ 7

    C.  Internet Notice .............................................................................. 7

    D.  Settlement Website and Toll-Free Number .............................. 7

    E.  CAFA Notice .................................................................................. 8

    F.  Settlement Administration Costs ................................................ 8

IV.  FINAL APPROVAL IS WARRANTED ............................................... 8

    A.  The Settlement Approval Process............................................... 8

    B.  The Settlement is Fair, Reasonable, and Adequate, and Should be
Approved.......................................................................................... 9

        1.  The Strength of the Plaintiffs' Case Compared to the Terms
of the Proposed Settlement Supports Final Approval.................. 10

            a.  The Monetary Amount Offered in Settlement
Supports Final Approval .................................................. 10

            b.  The Strength of Plaintiffs' Case Supports Final
Approval .......................................................................... 11

        2.  Continued Litigation is Likely to be Complex, Lengthy,
and Expensive, and Thus This Factor Favors Final
Approval ............................................................................... 14

        3.  Class Members have Responded Positively to the
Settlement, Supporting Final Approval ...................................... 14

        4.  Class Counsel Strongly Endorse the Settlement........................... 15

        5.  The Stage of the Proceedings and the Amount of Discovery
Completed Supports Final Approval .......................................... 16

V.  CONCLUSION................................................................................... 17

## CASES

*Adams v. AllianceOne Receivables Mgmt. Inc.,*
   No. 08-cv-00248, Dkt. Nos. 116 & 137 (S.D. Cal.) .................................................................11

*Aliano v. Joe Caputo & Sons - Algonquin, Inc.,*
   No. 09 C 910, 2011 U.S. Dist. LEXIS 48323 (N.D. Ill. May 5, 2011) ....................................13

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee,*
   616 F.2d 305 (7th Cir. 1980), overruled
   on other grounds by *Felzen v. Andreas,*
   134 F.3d 873 (7th Cir. 1998) ...........................................................................................8, 10, 11

*Arthur v. Sallie Mae, Inc.,*
   No. 10-cv-132413, 2012 U.S. Dist. LEXIS 132413 (W.D. Wash. Sept. 17, 2012) .................12

*Chapman v. First Index, Inc.,*
   No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556 (N.D. Ill. March 4, 2014) ...............................13

*G.M. Sign, Inc. v. Brinks Manufacturing Company,*
   No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084 (N.D. Ill. March 4, 2014) ..................................13

*Higginbotham v. Hollins,*
   No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) ...............................12

*In re AT&T Mobility Wireless Data Servs. Sales Litig.,*
   270 F.R.D. 330 (N.D. Ill. 2010)...............................................................................................10

*In re Capital One Telephone Consumer Protection Act Litigation,*
   Master Dkt. No. 12-cv-10064, MDL No. 2416 (N.D. Ill.) .......................................................1, 3

*In re Mexico Money Transfer Litig.,*
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) ......................................................................................15

*In re Southwest Airlines Voucher Litig.,*
   No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735 (N.D. Ill. Dec. 6, 2013) ................................15

*Isby v. Bayh,*
   75 F.3d 1191 (7th Cir. 1996) ................................................................................................8, 10

*Kramer v. Autobytel,*
   No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012)..........................11

*Malta v. Fed. Home Loan Mortg. Corp.,*
   No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013)................................11

*McKinnie v. JP Morgan Chase Bank, N.A.,*
   678 F. Supp. 2d 806 (E.D. Wis. 2009).......................................................................................15

*Palmer v. Sprint Nextel Corp.,*
   No. 09-cv-01211, Dkt. Nos. 84 & 91 (W.D. Wash.) .................................................................11

*Phillips Randolph Enters., LLC v. Rice Fields,*
   No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027 (N.D. Ill. Jan. 11, 2007) ...................................13

*Savanna Group, Inc. v. Trynex, Inc.,*
   No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277 (N.D. Ill. Jan. 4, 2013).....................................13

*Schulte v. Fifth Third Bank,*
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ..........................................................................14

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) ......................................................................................10

**STATUTES**

28 U.S.C. § 1715 ...............................................................................................................8

47 U.S.C. § 227(b)(1)(A) ...................................................................................................2

**RULES**

Fed. R. Civ. P. 23(e)(2) .....................................................................................................9

**TREATISES**

4 *Newberg on Class Actions* § 11.41 (4th ed. 2002).........................................................8

Manual for Complex Litigation (Fourth) (2004) § 21.63 ..................................................9

Michael O'Rielly, FCC Commissioner, <u>TCPA: It is Time to Provide Clarity</u>, FCC Blog
    (Mar. 25, 2014) ...........................................................................................................12

**REGULATIONS**

In the Matter of Rules and Regulations Implementing the Telephone Consumer
    Protection Act of 1991, 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg.
    (P&F) 877, 2008 WL 65485 (F.C.C.)........................................................................11

## I.    <u>INTRODUCTION</u>

On July 25, 2014, the Court granted preliminary approval of the Settlement.  Dkt No. 59.
Per the Court-approved notice plan, direct individual notice of the Settlement was disseminated
to over 7.1 million of the approximately 9 million Class Members via email and mail.  Dkt. No.
71-1, ¶¶ 10-17.  Notice was also published in *USA Today* and *People* magazines and internet
banner advertisements were targeted to internet users in specific categories and users who
searched for content relevant to this case.  *Id.*, ¶¶ 18-21.  Class Members have until November 4,
2014 to submit claims.  Dkt. No. 59.  The Fairness Hearing is scheduled for November 21, 2014
at 11:00 a.m.  *Id.*  By this motion, Plaintiffs respectfully request that the Court conduct a final
review of the Settlement and approve the Settlement as fair, reasonable, and adequate.

Class Counsel have extensive experience litigating TCPA class actions and other
consumer class actions, and were well-informed about the legal and factual issues involved in
this matter.  The Settlement is the product of extensive arm's-length, highly adversarial
negotiations between the parties and their counsel, which included a full-day mediation session
with a well-respected mediator and former magistrate judge, the Honorable Edward A. Infante
(Ret.) of JAMS.  The Settlement requires HSBC to pay what is believed to be the one of the
largest cash sums in the 22-year history of the TCPA—$39,975,000—into a non-reversionary
settlement fund ("Fund").  Indeed, to Class Counsel's knowledge, the Settlement amount comes
second only to the settlement fund in *In re Capital One Telephone Consumer Protection Act
Litigation*, Master Dkt. No. 12-cv-10064, MDL No. 2416 (N.D. Ill.) (Holderman, J.) ("Capital
One Action").  This result is outstanding, particularly in view of the risks and delays involved in
continued litigation.  Upon approval, the net proceeds of the Settlement Fund will immediately
be distributed pro rata to every claimant; no money will revert back to HSBC.

While the claims deadline has not yet passed, the reaction from the Class thus far has
been very positive.  As of the date of this motion, approximately 218,063 claims have been

submitted, while just 27 persons have timely asked to be excluded and 9 have timely objected.[1] Class Counsel expect, based on their experience in similar cases, that many more Class Members will submit claims as the November 4, 2014 deadline approaches.

For the foregoing reasons, and as detailed below, the Settlement meets the standards for final approval, and should therefore be approved.

## II.   STATEMENT OF THE FACTS

The factual and procedural background of this litigation was set forth in detail in Plaintiffs' Amended Memorandum in Support of Motion for Preliminary Approval (Dkt. No. 53). For the Court's convenience, Plaintiffs provide a short summary of the facts below.

### A.   The TCPA Claims

Plaintiffs alleged that HSBC Finance Corporation, successor by merger to HSBC Bank Nevada, N.A. and HSBC Card Services Inc. (together, "HSBC") called Plaintiffs and Class Members on their cell phones through the use of automatic telephone dialing systems and/or using an artificial or prerecorded voice without their prior express consent, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A). HSBC denies all of Plaintiffs' allegations and argues that it had express consent to make automated, prerecorded calls to Plaintiffs and Class Members on their cell phones.

### B.   Plaintiffs Thoroughly Investigated the TCPA Claims

The Settlement is the result of two years of hard-fought litigation including months-long disputed discovery efforts. Plaintiff Kenneth Mills originally filed a class action complaint against HSBC in the United States District Court, Northern District of California, Case No. 12-cv-04010-JST, on July 30, 2012. In the context of that action, Mills served classwide discovery seeking information on, among other things, HSBC's policies and practices for making the autodialed calls at issue and call record data. HSBC initially refused to provide responses to nearly all of the discovery sought. The parties subsequently engaged in months-long meet-and-

---

[1] Supplemental Declaration of Lael Dowd Concerning Claims, Opt-Outs, and Objections ("Dowd Decl."), ¶¶ 2-4. Class Counsel will provide an updated declaration from the Settlement Administrator listing the total number of claims prior to the Final Approval hearing.

confer sessions regarding the discovery, culminating in a joint discovery dispute letter and an in-person conference at court. Following this, HSBC finally served responses to the discovery and began producing thousands of pages of documents. Still, it took many more months to get the call record data necessary to fully evaluate the claims, as such data now resides with non-party Capital One Financial Corporation ("Capital One").[2]

On October 24, 2013—just two weeks before the then-pending class certification deadline—the parties agreed to mediate. At the time the parties agreed to mediation, Plaintiff Mills' counsel had already drafted a motion for class certification. Nevertheless, to allow HSBC to obtain the necessary call data from Capital One and to focus on mediation, the parties sought to extend the class certification hearing and briefing deadlines. While the California court granted a limited extension of time on November 1, 2013, it warned the parties that it was "very unlikely to continue" the newly established March 14, 2014 class certification deadline.[3]

On January 10, 2014, Plaintiff Wilkins filed the instant action, which was assigned to this Court. At that time, the Capital One Action was (and remains) pending before this Court. With the March 14, 2014 deadline rapidly approaching, and having not obtained all the data and confirmatory discovery necessary to reach a settlement, Plaintiff Mills determined that it made logical sense to coordinate the *Mills* and *Wilkins* actions here, both to provide them the time required to conduct the necessary discovery to permit for informed mediation and because of the relationship between the claims and data between HSBC and Capital One.[4] Accordingly,

---

[2] Declaration of Jonathan D. Selbin in Support of Plaintiffs' Motion for Final Approval (Selbin Decl."), ¶¶ 10-14.

[3] *Id.*, ¶¶ 15-17.

[4] Discovery efforts were particularly complicated in this action because HSBC sold its credit card portfolio at issue, and the underlying infrastructure, to non-party Capital One. Thus, HSBC did not possess the call record data and documents, and also did not have access to employees who could search and produce such data and documents. Class Counsel were therefore required to expend additional time and effort coordinating with Capital One to retrieve the data, and also had to hire their own expert to analyze the data. Class Counsel reluctantly agreed to extend the class certification deadlines pending in the *Mills* action only after realizing that the data was significantly more complicated and time-consuming to retrieve and analyze than call record data in other TCPA litigation in which they've been involved. *Id.*, ¶ 17.

Plaintiffs dismissed the *Mills* action on March 6, 2014 and filed an Amended Complaint in this action on March 7, 2014 adding Mills as a class representative.[5]

Prior to the parties' mediation, HSBC provided call data showing the number of unique cell phone numbers HSBC called during the class period. On November 15, 2013, Plaintiffs served interrogatories aimed at confirming the number of Class Members and determining the number of Class Members for whom HSBC possesses contact information. Class counsel analyzed these databases and also retained and worked with an expert in automated telephone dialing systems to further analyze the databases. Plaintiffs also took a 30(b)(6) deposition confirming the information provided in the interrogatories on June 3, 2014.[6]

Thus, by the time a Settlement was finally reached through a mediator's proposal that came months after the initial January 14, 2014 mediation and after thoroughly reviewing confirmatory discovery,[7] Plaintiffs had fully investigated and evaluated the claims. The Settlement Agreement is a result of these arms-length negotiations and investigative efforts.

### C.    The Proposed Settlement

The Settlement's terms were summarized in the Plaintiffs' preliminary approval papers, are contained in the Settlement Agreement that is attached to Plaintiffs' Amended Memorandum in Support of Motion for Preliminary Approval (Dkt. No. 53). The main terms are again summarized below for the Court's convenience.

### 1.    The Settlement Class

The Settlement Class is defined as follows:

> All persons within the United States to whom, on or after May 31, 2008 through May 1, 2012, a non-emergency telephone call was attempted by defendant HSBC Card Services Inc., or any other entity on behalf of defendant HSBC Finance Corporation, successor by merger to HSBC Bank Nevada, N.A., to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice. Excluded from the Settlement Class are HSBC and any affiliate or subsidiary of HSBC, along

---

[5] *Id.*, ¶ 17.

[6] *Id.*, ¶ 16.

[7] *Id.*, ¶¶ 19-22.

with any employees thereof, and any entities in which any of such companies have a controlling interest, as well as all persons who validly opt out of the Settlement Class.

Agreement § II.X. Plaintiffs' Amended Memorandum in Support of Motion for Preliminary Approval (Dkt. No. 53) originally estimated the Class size at 10,191,936, as this was based on the number of unique cell phone numbers to which HSBC made calls. However, after receiving the data regarding these cell phone numbers and removing duplicate records, the Class size is now more accurately estimated to be approximately 9,065,262 persons. *See* Dkt. No. 71-1, ¶ 16.

### 2. Monetary Relief for Settlement Class Members[8]

The Settlement requires HSBC to create a non-reversionary Settlement Fund of $39,975,000. Agreement §§ II.W, III.C. Out of this Fund, eligible Settlement Class Members who file a qualified claim will receive a Cash Award in the form of a cash payment. Agreement § III.F. The amount of each Class Member's Award will be based on a *pro rata* distribution, depending on the number of valid and timely claims. *Id.* No amount of the Settlement Fund will revert to HSBC. Agreement § III.C. While it is not possible to predict the precise amount of the Cash Awards until all claims have been submitted, assuming that an additional 22,000 Class Members submit claims between now and the November 4, 2014 deadline (for a total of approximately 240,000 claims), and the Court awards the requested attorneys' fees and service awards, Class Members stand to receive approximately $111 each.

In the event that the combined amounts of any settlement payment checks to Class Members that remain uncashed for more than 180 days after the date on the checks exceed $50,000, a second *pro rata* distribution will be made to all Class Members who made valid and timely claims. Agreement § III.G. In the event that the combined amounts of any settlement payment checks to Class Members that remain uncashed for more than 180 days is equal or less than $50,000, the money will be distributed *cy pres* to the Equal Justice Works ("EJW") to fund

---

[8] Because HSBC ceased its calling practices entirely when it sold the credit card portfolio at issue to non-party Capital One, the Settlement does not provide for prospective change in business practices relief.

fellowships designed to protect consumers against unfair debt collection practices.  Agreement § III.F.5, III.G.  That is, no more than $50,000 total will be distributed *cy pres*.

### 3.    Class Release

In exchange for the benefits allowed under the Settlement, Class Members who do not opt out will provide a release tailored to the practices at issue in this case.  Specifically, they will release all claims "that arise out of or relate" to the "use of an 'automatic telephone dialing system' or an 'artificial or prerecorded voice' to make 'calls' to a cellular telephone." Agreement § III.R.

### 4.    Attorneys' Fees and Class Representative Service Awards

On September 5, 2014, Class Counsel moved the Court for attorneys' fees in the amount of 30% of the Settlement Fund, and for service awards to be paid to the Plaintiffs from the Settlement Fund in the amount of $5,000 each, or $10,000 total.  Dkt. No. 65.  Neither approval or enforceability of the Settlement is contingent on Court approval of an award of attorneys' fees or costs or service awards in that amount.  Agreement § III.I.  In other words, the Settlement is enforceable so long as the Court approves it, regardless of the fees and costs awarded.

## III.    CLASS NOTICE HAS BEEN DISSEMINATED

The notice program approved by the Court (Dkt. No. 59) has been fully implemented by the parties and the Court-approved Settlement Administrator, Garden City Group ("GCG"), in accordance with the Court's direction.  *See generally* Dkt. No. 71-1.

### A.    Direct Mail and Email Notice

Beginning on August 1, 2014 and continuing through August 6, 2014, GCG disseminated 6,586,221 notices via email to all potential Settlement Class Members for whom a facially valid email address was available.  After completion of this initial effort, GCG received back 744,658 undeliverable emails.  GCG thereafter sent notice via mail to those Class Members with undeliverable emails, with the exception of 32 Class Members who had undeliverable email addresses and no available mailing address.  GCG also sent notice via mail to 667,698 Class Members whose records did not contain an email address but did contain a mailing address.

Mailed notices that were returned to GCG with forwarding information were promptly re-mailed to the updated addresses. GCG was also able to re-mail 212,581 of the 247,731 mailed notices that were returned without forwarding information by conducting advanced address searches. In total, 7,184,872 of the approximately 9,065,262 Class Members (over 79.2% of the Class) were given direct notice of the Settlement. Dkt. No. 71-1, ¶¶ 10-17.

**B.**     **Published Notice**

On August 6, 2014, notice was published in *USA Today*, which has a circulation of over 1.3 million. On September 8, 2014, notice was published in *People* magazine, which has a circulation of over 3.5 million. Dkt. No. 71-1, ¶ 18.

**C.**     **Internet Notice**

Between August 7, 2014 and September 2, 2014, internet banner advertisements ran on Xaxis, an online digital network. Keyword searches were used to deliver the banner advertisements to internet users who searched for specific content or terms relevant to the case. In addition, the banner advertisements were targeted to certain consumer segments by defined categories, such as "Financial Information Seekers." GCG estimates that the combined internet, publication, and direct notice programs reached 86% of HSBC users with a credit card balances and who own a cell phone. Dkt. No. 71-1, ¶¶ 20-21.

**D.**     **Settlement Website and Toll-Free Number**

On July 31, 2014, GCG established a Settlement Website (www.WilkinsTCPASettlement.com) where Class Members may go for information or to submit a claim electronically. The Settlement Website contains the following documents: (1) Supplemental Memorandum in Support of Motion for Attorneys' Fees; (2) Motion for Attorneys' Fees; (3) Memorandum in Support of Motion for Attorneys' Fees; (4) Declaration of Jonathan D. Selbin in Support of Motion for Attorneys' Fees; (5) Preliminary Approval Order; and (6) Settlement Agreement. As of October 3, 2014, the website had received 109,096 unique visitors. Dkt. No. 71-1, ¶ 22.

In addition, on August 1, 2014, GCG established a toll-free telephone number dedicated to answering telephone inquiries from Class Members and permitting Class Members to file a claim over the phone. As of October 3, 2014, GCG had received 22,638 calls. Dkt. No. 71-1, ¶ 23. Class Counsel have also responded to several inquiries from Class Members regarding the Settlement.[9]

### E.     CAFA Notice

Class Counsel is informed and believes that HSBC provided notice of the Settlement to the officials designated pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. To date, there have been no objections from any of the Attorneys' Generals to Class Counsel's knowledge.

### F.     Settlement Administration Costs

The costs of settlement administration and notice as of October 3, 2014 totaled approximately $945,000. GCG estimates that administration and notice costs through completion will be approximately $1,270,339. Dkt. No. 71-1, ¶ 27.

## IV.     FINAL APPROVAL IS WARRANTED

### A.     The Settlement Approval Process

As the Seventh Circuit has recognized, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, 'there is an overriding public interest in favor of settlement.' Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts

---

[9] Selbin Decl., ¶ 24.

naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases).  The traditional means for handling claims like those at issue here—individual litigation—would unduly tax the court system, require a massive expenditure of public and private resources and, given the relatively small value of the claims of the individual Class Members, would be impracticable.  Thus, the proposed Settlement is the best vehicle for Class Members to receive relief to which they are entitled in a prompt and efficient manner.

The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 describes a three-step procedure for approval of class action settlements:

> (1)  Preliminary approval of the proposed settlement at an informal hearing;
>
> (2)  Dissemination of mailed and/or published notice of the settlement to all affected class members; and
>
> (3)  A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

The first two steps in this process have occurred.  With this motion, Plaintiffs respectfully request that the Court take the third and final step in the process by granting final approval of the Settlement.

**B.**     **The Settlement is Fair, Reasonable, and Adequate, and Should be Approved**

A proposed class action settlement should be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  When determining whether a settlement is ultimately fair, adequate, and reasonable at the final approval stage, courts in this Circuit consider the following factors:

> (1) the strength of plaintiffs' case compared to the terms of the proposed settlement;
>
> (2) the likely complexity, length, and expense of continued litigation;
>
> (3) the amount of opposition to settlement among affected parties;

> (4) the opinion of competent counsel; and
>
> (5) the stage of the proceedings and the amount of discovery completed.

*Isby*, 75 F.3d at 1199. In reviewing these factors, courts view the facts "in a light most favorable to the settlement." *Id.* (quoting *Armstrong,* 616 F.3d at 315). In addition, courts "should not substitute their own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong*, 616 F.2d at 315.

Application of these factors here confirms that the settlement is fair, reasonable, and adequate, and should be finally approved.

### 1. The Strength of the Plaintiffs' Case Compared to the Terms of the Proposed Settlement Supports Final Approval

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel Techs, Inc. v. DHL Express (USA), Inc*., 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted). Nevertheless, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig*., 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations omitted).

### a. The Monetary Amount Offered in Settlement Supports Final Approval

The Settlement is a great result for the Class. It requires HSBC to pay $39,975,000 into a Settlement Fund—the second-largest cash sum for a TCPA class action settlement to date—out of which all eligible Class Members will receive their *pro rata* share of cash payments. The Settlement Fund is non-reversionary, ensuring that all or nearly all monetary benefits will go to Class Members—no amount of the Settlement Fund will return to HSBC.

Class Counsel acknowledge that the $39,975,000 fund does not constitute the full measure of statutory damages potentially available to the Class. This fact alone, however, should not weigh against final approval. "Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is

properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong*, 616 F.2d at 315. The Settlement was reached after extensive factual investigation and discovery of the claims and issues and after taking into consideration the risks involved in the actions, after arm's length negotiations presided by an experienced mediator and former judge, and via a mediator's proposal made after the mediation had concluded. Further, the Settlement compares favorably to other TCPA class actions settlements. Indeed, courts have approved other TCPA class action settlements involving similarly large punitive classes that achieved much smaller *pro rata* monetary recoveries.[10]

Moreover, as discussed further below, continuing to litigate the claims would entail significant risk and delay. The key here is that the Settlement provides class members with real monetary relief, despite the fact that this is a purely statutory damages case in which class members incurred nominal economic damages or whose actual damages (such as stemming from the invasion of their privacy) are difficult or impossible to quantify.

**b.      The Strength of Plaintiffs' Case Supports Final Approval**

Plaintiffs continue to believe that their claims against HSBC have merit and that they could make a compelling case if their claims were tried. Nevertheless, Plaintiffs and the Class would face a number of difficult challenges if the litigation were to continue.

First, the Parties have competing interpretations of what constitutes "prior express consent" under the TCPA based on the FCC's January 4, 2008 declaratory ruling, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.)

---

[10] *See, e.g., Kramer v. Autobytel*, No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) (approving $12.2 million settlement to benefit 47 million class members); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) (preliminarily approving $17.1 million settlement to 5,887,508 class members; final approval granted at Dkt. No. 91); *Adams v. AllianceOne Receivables Mgmt. Inc.*, No. 08-cv-00248, Dkt. Nos. 116 & 137 (S.D. Cal.) (attached as Exhibits J & K to Selbin Decl.) (approving $9 million settlement to benefit 6,696,743 class members); *Palmer v. Sprint Nextel Corp.*, No. 09-cv-01211, Dkt. Nos. 84 & 91 (W.D. Wash.) (attached as Exhibits L & M to Selbin Decl.) (approving $5.5 million settlement to benefit 18.1 million class members).

(hereinafter "Declaratory Ruling").  The Declaratory Ruling is the FCC's official interpretation of the governing provisions of the TCPA.  The FCC's Declaratory Ruling addresses the meaning of "prior express consent" and states that "prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."  Plaintiffs maintain that Paragraph 10 requires that the cell phone number be "provided during the transaction that resulted in the debt owed," *i.e.* during the "origination" of the credit or banking relationship.  HSBC, however, interprets the term "transaction" broadly to mean any time during the multi-year life of the relationship.  Based on this interpretation, HSBC maintains that some or all of the Class Members gave it prior express consent to contact them at their cell phone numbers.  If the Court found that the FCC's Declaratory Ruling and/or the TCPA permits "prior express consent" to be given: (1) any time after origination on documents such as correspondence, updated information forms, forbearance requests, and the like, and/or (2) verbally, the amount of recoverable damages could be reduced significantly or eliminated altogether.  *See, e.g., Arthur v. Sallie Mae, Inc.,* No. 10-cv-132413, 2012 U.S. Dist. LEXIS 132413, at *4 (W.D. Wash. Sept. 17, 2012) (granting final approval of TCPA settlement "in part because of the novelty of central issues").

Indeed, banks and other entities have been actively lobbying the FCC to clarify the meaning of consent under the TCPA, and the FCC is accordingly considering multiple petitions on this issue.  The FCC could issue a ruling at any time which might undermine Plaintiffs' interpretation.  *See, e.g., Higginbotham v. Hollins*, No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) (staying litigation pending FCC's consideration of and rulings on TCPA petitions and citing cases granting similar stays).  *See also* Michael O'Rielly, FCC Commissioner, TCPA: It is Time to Provide Clarity, FCC Blog (Mar. 25, 2014) (*available at* http://www.fcc.gov/blog/tcpa-it-time-provide-clarity) (asserting that "the FCC needs to address this inventory of petitions as soon as possible" as it has the "opportunity to answer important

questions and much needed guidance on a variety of TCPA issues, including . . . whether consent can be inferred from consumer behavior or social norms . . . .").

Second, while Plaintiffs continue to believe that class certification would be achievable, HSBC consistently argued that class certification would be inappropriate due to the question of whether Class Members consented to the calls at issue. If the Court were to accept HSBC's interpretation of "prior express consent" under the statute, identifying which class members consented and in what manner could be difficult. And, "[c]ourts are split on whether the issue of individualized consent renders a TCPA class uncertifiable on predominance and ascertainability grounds, with the outcome depending on the specific facts of each case." *Chapman v. First Index, Inc*., No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556, at *6-7 (N.D. Ill. March 4, 2014) (citing cases). For example, in *Savanna Group, Inc. v. Trynex, Inc.,* No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277, at *49 (N.D. Ill. Jan. 4, 2013), the court granted class certification and rejected the defendant's argument that questions of consent caused individual issues to predominate, noting that the defendant had not offered evidence tending to show that any particular class member consented to the faxes at issue, whereas in *G.M. Sign, Inc. v. Brinks Manufacturing Company*, No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084, at *7-10 (N.D. Ill. March 4, 2014), the court declined to certify a class, finding that the defendant offered evidence illustrating that consent could not be shown with common proof. If HSBC were able to present convincing facts to support its position, there is a risk that the Court would decline to certify the class, leaving only the named Plaintiffs to pursue their individual claims.

Third, at least some courts view awards of aggregate, statutory damages with skepticism and reduce such awards—even after a plaintiff has prevailed on the merits—on due process grounds. *See, e.g., Aliano v. Joe Caputo & Sons - Algonquin, Inc.,* No. 09 C 910, 2011 U.S. Dist. LEXIS 48323 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."); *but see*

*Phillips Randolph Enters., LLC v. Rice Fields*, No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027, at *7-8 (N.D. Ill. Jan. 11, 2007) ("Contrary to [defendant's] implicit position, the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple violations.").

Finally, there is a risk of losing a jury trial. And, even if Plaintiffs did prevail at trial, any judgment could be reversed on appeal. The Settlement provides substantial relief to Class Members without delay.

### 2. Continued Litigation is Likely to be Complex, Lengthy, and Expensive, and Thus This Factor Favors Final Approval

Litigation would likely be lengthy and expensive if this action were to proceed. Although the parties engaged in extensive discovery efforts, additional discovery—such as depositions—would need to commence. And, motions practice including Plaintiffs' motion for class certification, and possibly a motion for summary judgment brought by HSBC, would occur. The parties might also engage experts to analyze HBSC's call data. It would likely be more than a year before the case went to trial. And, any judgment in favor of Class Members could be further delayed by the appeal process. Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows Plaintiffs and Class Members to receive immediate and certain relief. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (citation omitted) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### 3. Class Members have Responded Positively to the Settlement, Supporting Final Approval

Class Members' response to the Settlement has been overwhelmingly positive. The deadline for Class Members to submit claims is not until November 4, 2014. Yet, Class Members have already filed 149,252 claims.[11] Class Counsel expect that many more Class Members will make claims nearer to the deadline. Only 27 Class Members of the more than 9 million Class Members timely requested to be excluded from the Settlement, representing

---

[11] Dowd Decl., ¶ 2.

approximately 0.000003% of the Class.[12]  And, only 9 Class Members timely objected to the

Settlement, representing only 0.000001% of the class.[13]  Half of these objections were submitted

by so-called "professional" or "serial" objectors who regularly make objections to class action

settlements for their own pecuniary gain.  *See* Class Counsel's Response to Objections, filed

concurrently herewith.  This factor therefore favors final approval.  *See, e.g., Isby* 75 F.3d at

1200 (affirming final approval of settlement where 13% of the class submitted written

objections); *In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 U.S. Dist. LEXIS

120735, at *21 (N.D. Ill. Dec. 6, 2013) (finding that the "low level of opposition" amounting to

0.01% of the class "supports the reasonableness of the settlement").

### 4.  Class Counsel Strongly Endorse the Settlement

Class Counsel and Plaintiffs strongly endorse this Settlement and believe that it

represents a great result for Class Members.[14]  Class Counsel's opinion on the Settlement is

entitled to great weight, particularly because: (1) Class Counsel are competent and experienced

in class action litigation (particularly in similar TCPA class action cases); [15] (2) Class Counsel

engaged in formal and informal discovery and exhaustively evaluated the claims in the context of

settlement negotiations;[16] and (3) the Settlement was reached at arm's length through

negotiations by experienced counsel, after a full-day mediation before an experienced mediator

and former judge, and after the parties accepted the mediator's proposal.[17]  *See McKinnie v. JP*

*Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that

"counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by

a mediator. . . suggest that the settlement is fair and merits final approval."); *see also In re*

*Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant

---

[12] *Id.*, ¶ 3.

[13] *Id.*, ¶ 4.

[14] Selbin Decl. ¶ 25.

[15] *Id.*, ¶¶ 3-7.

[16] *Id.*, ¶¶ 10-18, 22.

[17] *Id.*, ¶¶ 19-21.

weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").

5. **The Stage of the Proceedings and the Amount of Discovery Completed Supports Final Approval**

The Settlement was informed by Class Counsel's thorough litigation and analysis of the factual and legal issues involved. It is the result of two years of hard-fought litigation including months-long disputed discovery efforts that culminated in a motion to compel (through a joint discovery dispute letter) and an in-person discovery conference at the Court. Much of the discovery and litigation occurred in the *Mills* action, which originally filed in the United States District Court, Northern District of California, Case No. 12-cv-04010-JST on July 30, 2012. The parties agreed to mediation on the very eve of class certification. Prior to and following mediation, HSBC produced and Class Counsel reviewed, along with their expert, the call record data and other information necessary to confirm that the Settlement is fair, reasonable, and adequate.[18]

Settlement negotiations were prolonged and hard-fought, spanning many months. The parties participated in a full-day mediation on January 14, 2014 before the Honorable Edward A. Infante (Ret.) of JAMS. Class Counsel continually advocated for a larger fund for the Class, while Defendants wanted a smaller fund. The case settled only after the parties accepted a mediator's proposal. Thereafter, the parties spent numerous hours negotiating the final settlement terms and drafting the Settlement Agreement.[19]

Accordingly, the final terms of Settlement were agreed to only after Class Counsel thoroughly vetted the claims and potential damages through the exchange of both informal and formal discovery and participated in lengthy arm's length negotiations. Thus, this factor favors final approval.

---

[18] *Id.*, ¶¶ 10-18, 22.
[19] *Id.*, ¶¶ 19-21, 23-24; Dkt. No. 53-2 (Infante Decl.), ¶¶ 4-8.

## V.  CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter an

Order granting final approval of the Settlement.

Dated: October 28, 2014                Respectfully submitted,

                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

                                       By: */s/ Jonathan D. Selbin*
                                            Jonathan D. Selbin

                                       Jonathan D. Selbin
                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       250 Hudson Street, 8th Floor
                                       New York, NY  10013
                                       Telephone:  (212) 355-9500
                                       Facsimile:  (212) 355-9592

                                       Daniel M. Hutchinson
                                       Nicole D. Sugnet
                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       275 Battery Street, 29th Floor
                                       San Francisco, CA  94111-3339
                                       Telephone:  415.956.1000
                                       Facsimile:  415.956.1008

                                       Matthew R. Wilson
                                       Michael Joseph Boyle, Jr.
                                       MEYER WILSON CO., LPA
                                       1320 Dublin Road, Suite 100
                                       Columbus, OH  43215
                                       Telephone:  (614) 224-6000
                                       Facsimile:  (614) 224-6066

                                       Alexander H. Burke
                                       BURKE LAW OFFICES, LLC
                                       155 North Michigan Avenue, Suite 9020
                                       Chicago, IL 60601
                                       Telephone:  (312) 729-5288
                                       Facsimile:  (312) 729-5289

                                       Beth E. Terrell
                                       TERRELL MARSHALL DAUDT & WILLIE PLLC
                                       936 North 34th Street, Suite 40
                                       Seattle, WA 98103
                                       Telephone:  (206) 816-6603
                                       Facsimile:  (206) 350-3528

                                       *Attorneys for Plaintiffs and the Proposed Class*

1202266.2