## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL WILKINS and KENNETH MILLS, on behalf of themselves and others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 14 C 190 |
| HSBC BANK NEVADA, N.A. and HSBC CARD SERVICES, INC., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

This is the second multi-million dollar class action settlement this court has reviewed and addressed in the last three weeks in which the plaintiff class has sued credit card companies for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq. See In re Capital One Tel. Consumer Prot. Act Lit.*, No. 12 C 10064, 2015 WL 605203 (N.D. Ill. Feb. 12, 2015) ("*Capital One*").

On January 10, 2014, plaintiff Michael Wilkins ("Wilkins") filed the initial class action complaint in this case against defendants HSBC Bank Nevada, N.A. and HSBC Card Services, Inc. (collectively, "HSBC"), alleging that between 2010 and 2012, HSBC repeatedly contacted Wilkins on his cellular telephone with an automated message "at all hours of the day." (Dkt. No. 1 ¶¶ 16-17.) Wilkins, an HSBC credit card holder, did not elaborate on the content of HSBC's alleged messages other than to allege that HSBC made the calls for non-emergency purposes in violation of the TCPA. (*Id.* ¶¶ 14, 25.)

On March 7, 2014, Wilkins and another plaintiff, Kenneth Mills ("Mills"), filed an

amended class action complaint ("Amended Complaint") (Dkt. No. 27 ("Am Compl.")). Wilkins, in the Amended Complaint, alleges the same conduct he alleged in his original complaint. (Am. Compl. ¶¶ 14-20.) Mills, also an HSBC cardholder, alleges that HSBC repeatedly called his cell phone with an automated message between April 2012 and March 7, 2014, the date of the Amended Complaint's filing. (*Id.* ¶ 24.) Both plaintiffs allege that they never consented to HSBC calling them on their cell phones or calling them using an automated message. (*Id.* ¶¶ 16, 23.) Wilkins and Mills further allege that between 2010 and 2014, HSBC contacted "tens of thousands" of other cardholders on their cell phones through the use of an automatic telephone dialing system or an artificial or prerecorded voice, in violation of the TCPA (collectively, along with Wilkins and Mills, the "Plaintiffs"). (*Id.* ¶¶ 36-37.) On March 24, 2014, both HSBC defendants filed their respective answers (Dkt. Nos. 31, 32) to the Amended Complaint.

On July 25, 2014, the court granted Plaintiffs' unopposed request for preliminary approval of class settlement (Dkt. No. 53) and entered an Order (Dkt. No. 59) conditionally certifying a settlement class, preliminarily approving the class action settlement, approving the notice plan, and appointing a claims and notice administrator. Since then, Plaintiffs have filed memoranda in support of Plaintiffs' motion (Dkt. No. 79) for final approval of the class action settlement. Class Counsel, consisting of the attorneys who collectively represent the class, have also filed a motion for approval of attorneys' fees and for service awards to Wilkins and Mills as the class representatives. (Dkt. No. 68.) Nine people out of approximately 9 million settlement class members filed briefs or statements in opposition to the Amended Settlement Agreement and Release ("Settlement Agreement") (Dkt. No. 53 Ex. A) and Class Counsel's requested fee award. On November 21, 2014, after the Garden City Group, Inc. ("GCG") provided notice of the settlement to class members, the court conducted a fairness hearing to allow any class members who expressed the desire to address the court regarding the settlement to do so. (Dkt.

Nos. 94, 95.) None of the nine objectors appeared to address the court on November 21, 2014.

For the reasons explained below, the court grants the motion for final approval of the class action settlement (Dkt. No. 79) because under the circumstances and the law the settlement reached in this class action case is fair, reasonable, and adequate. The court grants in part and denies in part Class Counsel's motion for approval of attorneys' fees, and grants Class Counsel's requested incentive awards to Wilkins and Mills in the amount of $5,000 each. (Dkt. No. 68.)

## BACKGROUND

### I.     History of the Litigation

On July 30, 2012, Mills filed a class action complaint against HSBC in the United States District Court for the Northern District of California, alleging HSBC called cardholders' cell phones for non-emergency purposes in violation of the TCPA. *See Mills* v. *HSBC Bank Nevada, N.A.*, No. 12 C 4010 (N.D. Cal.) (Tigar, J.). The parties spent the bulk of the next year disputing the scope of Mills's interrogatories and document requests, *see* No. 12 C 4010 (Dkt. No. 53), which were complicated by HSBC's May 2012 sale of its credit card portfolio to Capital One Financial Corporation ("Capital One")—itself no stranger to TCPA litigation. *See Capital One*, 2015 WL 605203. On July 12, 2013, U.S. Magistrate Judge Joseph Spero of the Northern District of California held a meet and confer in his chambers to assist the parties in resolving their discovery disputes. No. 12 C 4010 at Dkt. No. 61. The parties resolved their pending discovery disputes and, on October 24, 2013, informed Judge Tigar they had scheduled a private mediation of the case with retired U.S. Magistrate Judge Edward Infante. *Id.* at Dkt. No. 69. U.S. District Judge Jon Tigar extended the parties' class certification deadline until March 14, 2014 to permit the mediation, but stated that he would be "very unlikely to continue that date." *Id.* at Dkt. No. 71.

On January 10, 2014, as stated earlier in this opinion, Wilkins filed this class action case

against HSBC alleging HSBC made calls to Wilkins' and other cardholders' cell phones in violation of the TCPA between 2010 and 2012. (Dkt. No. 1.)

On January 14, 2014, four days later, the parties in the *Mills* action participated in a one-day mediation session with Judge Infante. The mediation session did not produce a settlement. It did, however, result in a consolidation of the two TCPA class actions pending against HSBC. Class counsel in the *Mills* action represented class members in three consolidated TCPA class actions against Capital One, which were also pending before this court and being mediated by Judge Infante. Capital One also held the HSBC cardholder data necessary to proceed with both the *Mills* and *Wilkins* actions. With the March 14, 2014 class certification deadline in the *Mills* action—which Judge Tigar had stated he was not inclined to extend—drawing near, Mills voluntarily dismissed his case in the Northern District of California on March 6, 2014, *see* No. 12 C 4010 at Dkt. No. 73, and joined Wilkins' lawsuit as a class representative the next day, March 7, through the filing of the Amended Complaint in this case. (Dkt. No. 27.)

Plaintiffs' Amended Complaint alleges that between 2010 and 2014, HSBC contacted class members on their cell phones for non-emergency purposes using an "artificial or prerecorded voice" or an "automatic telephone dialing system." (Am. Compl. ¶ 28.) Plaintiffs do not state the purpose of HSBC's "non-emergency calls," but because Wilkins and Mills are both HSBC credit cardholders, the court infers from the allegations that a good number of the calls allegedly related to class members' credit card account balances. The TCPA is clear that it prohibits callers from using an "automatic telephone dialing system or an artificial or prerecorded voice" to make *any* non-emergency calls to cell phones unless the callers have the "prior express consent of the called part[ies]." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA imposes statutory damages of $500 per call, which can be trebled if the court finds the violation to have been willful or knowing. 47 U.S.C. § 227(b).

On March 24, 2014, counsel again had a mediation session with Judge Infante.[1] (Dkt. No. 53 Ex. 3 ¶ 20.) On April 29, 2014, the parties informed this court that they had agreed to a settlement in principle, were in the process of negotiating a final settlement agreement, and were conducting confirmatory discovery, including a deposition of HSBC's chosen 30(b)(6) witness. (Dkt. No. 39.) On July 1, 2014, after the parties resolved a dispute related to the notice plan—HSBC unsuccessfully sought to exclude any form of internet notice (Dkt. No. 43)—Plaintiffs filed a motion for preliminary approval of the class action settlement (Dkt. No. 53) and attached a copy of the final Settlement Agreement. The court conducted a hearing in open court on July 22, 2014 and, on July 25, 2014, issued an order (Dkt. No. 59) granting Plaintiffs' motion (Dkt. No. 53). That order (1) conditionally certified the class for settlement purposes, (2) preliminarily approved the class action settlement, (3) approved the notice plan (including internet notice), and (4) set a fairness hearing on final approval of the settlement for November 21, 2014. (Dkt. No. 59.)

Beginning on August 1, 2014, GCG implemented the parties' direct notice plan, which entailed: (1) sending 6,586,221 summary notices via email to all potential class members who had email addresses reflected in HSBC's (or Capital One's) records; (2) mailing paper notices to 667,698 class members whose records did not contain an email address; (3) mailing paper notices to 744,658 class members with undeliverable emails; and (4) re-mailing paper notices with updated address information where the original mailings were returned undeliverable. In total, GCG provided direct notice of the Settlement Agreement to 7,184,872 of the approximately 9,065,262 class members, or about 79.2% of the class. GCG also published a summary notice in single issues of *USA Today* and *People* magazine, and ran internet banner

---

[1] Counsel do not state whether they met with Judge Infante in person or by phone.

advertisements on Xaxis, an online digital network. GCG estimates that combined the internet, print publication, and direct notice programs reached about 86% of "HSBC users with credit card balances and who own a cell phone." (*See* Dkt. No. 71-1 (summarizing notice efforts).) On October 3, 2014, GCG estimated that its total bill for notice and administration of the settlement would be approximately $1,270,339. (*Id.* ¶ 27.) No updated figures have been provided to the court as of the date of this opinion.

## II.    The Settlement Agreement

The important provisions of the Settlement Agreement define the settlement class and provide for monetary relief to class members and are summarized below.

The settlement class is defined as follows:

> All persons within the United States to whom, on or after May 31, 2008 through May 1, 2012, a non-emergency telephone call was attempted by defendant HSBC Card Services Inc., or any other entity on behalf of defendant HSBC Finance Corporation, successor by merger to HSBC Bank Nevada, N.A., to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice. Excluded from the Settlement Class are HSBC and any affiliate or subsidiary of HSBC, along with any employees thereof, and any entities in which any of such companies have a controlling interest, as well as all persons who validly opt out of the Settlement Class.

(Settlement Agreement § II.X.) The parties estimate that the class includes 9,065,262 members and that HSBC made 344,351,123 phone calls in alleged violation of the TCPA. (Dkt. No. 71-1 ¶ 16; Dkt. No. 64 at 1.)

The Settlement Agreement requires HSBC to establish a non-reversionary settlement fund of $39,975,000. (Settlement Agreement §§ II.W, III.C.) After subtracting notice and administration costs ($1,270,339), Class Counsel's requested service awards for class representatives Wilkins and Mills ($10,000), and Class Counsel's requested fee award ($11,992,500)—all of which will be paid out of the settlement fund—the value of the settlement

to class members is $26,702,161.[2] *See Pearson* v. *NBTY, Inc.*, 772 F.3d 778, 780-81 (7th Cir. 2014) (citing *Redman* v. *RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) (holding notice costs, administration costs, and attorneys' fees are not part of the value received from the settlement by class members). If all 9,065,262 class members had filed a claim, they would each have received $2.95. In this case, however, only 286,433 class members, or 3.16% of the class, filed a timely claim, so they will each receive at least $93.22. (Dkt. No. 90 at 3.) The settlement checks become void 180 days after issuance, at which time the Settlement Agreement provides for two alternative payouts. If, after 180 days, the combined amount of uncashed checks exceeds $50,000, the settlement administrator will make a second *pro rata* distribution to timely claimants. (Settlement Agreement § III.G.) If the combined amount of the uncashed checks does not exceed $50,000, then the administrator is to distribute the uncashed proceeds *cy pres* to the Equal Justice Works ("EJW") "to fund fellowships designed to protect consumers against unfair debt collection practices." (Settlement Agreement §§ III.F.5, III.G.) By the court's calculation, under the terms of the Settlement Agreement in its current form, if 536 or fewer claimants are delinquent in depositing their settlement checks, there will be a *cy pres* distribution to EJW; if 537 or more class members are delinquent, however, there will be a second *pro rata* distribution to the timely claimants.

At the November 21, 2014 final approval hearing (Dkt. No. 95), the court heard from Class Counsel and counsel for HSBC. Although the court invited specific objectors by name and anyone else present in the courtroom to speak, no objector addressed the court. Even though two

---

[2] The court does not subtract the *cy pres* award because, as discussed later in this opinion, the *cy pres* award exists only if timely claimants fail to deposit their settlement checks within 180 days.

objectors—Laura Fortman and Dawn Weaver—had previously indicated their desire to address the court (Dkt. Nos. 72, 75), they did not do so.

## LEGAL STANDARDS

### I.      Approval of a Proposed Settlement in Class Actions

A court may approve a settlement that would bind class members only if, after proper notice and a public a hearing, the court determines that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(3). Under Seventh Circuit law, a district court must, in evaluating the fairness of a settlement, consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc.* v. *DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby* v. *Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

 "The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)). Furthermore, "[i]n conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.' To do so, the court should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.'" *Id.* (quoting *Reynolds* v. *Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002)).

"Federal courts naturally favor the settlement of class action litigation." *Isby*, 75 F.3d at 1196. Nevertheless, the Seventh Circuit has warned that "the structure of class actions under

Rule 23 . . . gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood* v. *Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010) (emphasis omitted). District courts must therefore "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel*, 463 F.3d at 652. This court has endeavored to do that.

## II.    Attorneys' Fees in Class Actions

"In a certified class action, the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In determining a reasonable fee, the court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton* v. *Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). To determine the reasonableness of the sought-after fee in a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (*Synthroid I*). The probability of success at the outset of the litigation is relevant to this inquiry. *See Florin* v. *Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994).

In *Synthroid*, the Seventh Circuit held that the "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid I*, 264 F.3d at 721. The Seventh Circuit has further explained that "[t]he object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the

way of a fee in arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). *See also In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011) (recognizing that "[s]uch [an] estimation is inherently conjectural").

The Federal Rules of Civil Procedure allow the court, in a certified class action, to "award reasonable . . . nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Seventh Circuit has instructed that district courts must exercise their discretion to "disallow particular expenses that are unreasonable whether because excessive in amount or because they should not have been incurred at all." *Zabkowicz* v. *W. Bend Co., Div. of Dart Indus., Inc.*, 789 F.2d 540, 553 (7th Cir. 1986) (quoting *Henry* v. *Webermeier*, 738 F.2d 188, 192 (7th Cir. 1984)).

## ANALYSIS

### I.    Approval of the Class Settlement in This Litigation

Applying the five factors identified in *Synfuel*, this court concludes that the settlement is "fair, reasonable, and adequate," and therefore meets the requirements of Rule 23.

#### A.  Potential of Class Members' Recovery through Continued Litigation Balanced Against Settlement Amount Offered

"The most important factor" in determining whether a proposed settlement satisfies Rule 23 is the "strength of [Plaintiffs'] case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.2d at 653 (citations omitted). The Settlement Agreement requires HSBC to pay nearly $40 million into a settlement fund out of which all eligible class members who made a timely claim will receive their *pro rata* share, and maybe more if at least 537 claimants are delinquent in depositing their checks. According to the court's and Class Counsel's review of other TCPA class action cases, the settlement here represents the third-largest cash settlement in the history of the TCPA. *See Capital One*, 2015 WL 605203, at *19 (granting final approval to $75.5 million TCPA settlement); *Hageman* v. *AT&T Mobility LLC*, No. 14 C 0050,

at Dkt. No. 68 (D. Mont. Feb. 11, 2015) (granting final approval to a $45 million TCPA settlement)).

A $2.95 recovery by each class member is quite small. The timely claimants in this settlement, however, stand to each receive the sum of $93.22. The $93.22 payment to each timely claimant is reflective of the low claim rate in this case, and falls well below the $500 statutory recovery available for each phone call made in violation of the TCPA. If HSBC were found liable for all 344,351,123 calls alleged in Plaintiffs' Amended Complaint, HSBC would under the TCPA be liable for over $172 billion, and may be liable for over $516 billion if Plaintiffs proved the TCPA violations were knowing and willful.

As this court recently stated in *Capital One*, a case where this court approved a settlement providing $2.72 per class member, a settlement need not provide the plaintiffs a total victory, especially where the plaintiffs have suffered no actual damages and total victory would threaten the defendant's ability to continue on as a viable entity. *Capital One*, 2015 WL 605203, at *6 (citing *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (St. Eve, J.)). In such a circumstance, it is possible that a total plaintiffs' victory may not comport with due process considerations. *See, e.g.*, *Murray* v. *GMAC Mortg. Corp.*, 434 F.3d 948, 954 (holding an "unconstitutionally excessive [award] may be reduced"); *United States* v. *Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (holding a statutory penalty violates due process when it "is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable").

Furthermore, $2.95 per class member ($93.22 per claimant) is not a trifling sum in light HSBC's contention that most Plaintiffs would recover nothing if they continued through the litigation process. Unlike the defendants in *Capital One*, HSBC has not provided the court with a full-throated preview of its likely defenses in this case other than HSBC's cursory assertion that

most Plaintiffs provided consent to be contacted on their cell phones. (Dkt. No. 64 at 1-2.) The court, however, is cognizant of the potential challenges Plaintiffs face in successfully litigating this TCPA class action, since this court recently discussed those potential challenges in the court's opinion approving the settlement in *Capital One*. *See* 2015 WL 605203, at \*\*6-7.

First, Plaintiffs would have to address HSBC's argument that class members consented to be contacted on their cell phones by an automated message or using an automatic dialer. HSBC has not stated how or when most class members purportedly gave "prior express consent" to be called, but the court suspects that many class members may have consented pursuant to a condition contained in their cardholder agreements with HSBC, or by providing their cell phone numbers to HSBC at some point after opening their credit cards. "Prior express consent" under the TCPA is a term of art, the unsettled meaning of which has led to significant—and in this court's view, excessive—litigation. According to a 2008 FCC order, autodialed collection calls to "wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party," and are therefore permissible. *In Re Rules and Regulations Implementing the Telephone Consumer Prot. Act of 1991*, 23 F.C.C.R. 559 ¶ 9 (2008) ("2008 TCPA Order"); 47 U.S.C. § 227(b)(1)(A)(iii); *see also Greene* v. *DirecTV*, No. 10 C 117, 2010 WL 4628734, at \*3 (N.D. Ill. Nov. 8, 2010) (Kocoras, J.) (granting summary judgment on a TCPA claim where plaintiff provided his cell phone number as his contact number). Consequently, under the plain language of the 2008 TCPA, if any class members provided their cell phone numbers to HSBC, those class members, by doing so, also provided "prior express consent" to be contacted on their cell phones with an automated message or using an autodialer.

Unfortunately, the analysis does not end there. The same 2008 TCPA Order further states that "prior express consent is deemed to be granted only if the wireless number was provided by

the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." 2008 TPCA Order ¶ 10. Plaintiffs here, similar to plaintiffs in other TCPA cases, argue that they did not provide "prior express consent" within the meaning of the TCPA because they did not provide their cell phone numbers at the origination of the credit relationship. (Dkt. No. 81 at 12.) As this court noted in *Capital One*, the 2008 TCPA Order is susceptible to alternative interpretations and will continue to add significant risk to large TCPA litigation until the FCC clarifies the definition of "prior express consent" under the TCPA. 2015 WL 605203, at *6.

The second set of obstacles to Plaintiffs' potential success should Plaintiffs proceed to trial are the provisions of Federal Rule of Civil Procedure 23. HSBC's primary defense tactic throughout this case has been a steadfast refusal to undertake the discovery necessary to determine whether individual class members had, in fact, provided consent to be called. *See, e.g.*, No. 12 C 4010 (Dkt. No. 53). The difficulty of such discovery relates directly to class action manageability concerns and may pose a serious obstacle to class certification. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing predominance, a court must analyze "the likely difficulties in managing a class action," *id.* 23(b)(3)(D), which "encompass[ ] the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Identifying consenting class members and the precise timing and nature of their purported consent would require HSBC to sift through the records of HSBC's interactions with each customer, a task further complicated by the fact that Capital One, which is not a party to this litigation, possesses the relevant records of customer transactions that occurred after Capital

One's acquisition of HSBC's credit card portfolio. As the court noted in the *Capital One* litigation, such individual determinations do not always comport with Rule 23(b)(3)'s manageability requirement and have caused some courts to reject class certification. *See Capital One*, 2015 WL 605203, at *7 (collecting cases).

Third, Plaintiffs here run the risk that potentially forthcoming FCC orders may extinguish their claims. The FCC is considering petitions seeking to exclude predictive dialers used for non-telemarketing purposes, such as debt collection, from the TCPA's prohibition on automatic dialers. 2015 WL 605203, at *7 (summarizing petitions). It is not clear whether these petitions, if granted, would relieve HSBC of liability since the specific factual allegations contained in the Amended Complaint relate mostly to HSBC's frequent use of an automated message, rather than an autodialer. There is another set of petitions asking the FCC to clarify how and when consent may be expressed by consumers. *See* Michael O'Rielly, FCC Commissioner, *TCPA: It is Time to Provide Clarity*, FCC Blog (Mar. 25, 2014) (*available at* http://www.fcc.gov/blog/tcpa-it-time-provide-clarity) (asserting that "the FCC needs to address this inventory of petitions as soon as possible," and "answer . . . whether consent can be inferred from consumer behavior or social norms"). If the FCC were to issue an order clarifying that a customer provides "prior express consent" by providing his or her cell phone number to the caller at any point in time, many or all of the class members would be left without a TCPA claim.

Accordingly, considering HSBC's potentially meritorious defenses and the legal uncertainty concerning the application of the TCPA, the court concludes that Plaintiffs would probably face an uphill battle proceeding to trial and, once there, obtaining relief. The settlement provides value that is fair considering the very real possibility that Plaintiffs may recover nothing if they were to proceed further with the litigation.

**B. Likely Complexity, Length and Expense of Litigation**

In *Synfuel*, the Seventh Circuit instructed that the likely complexity, length, and expense of continued litigation are relevant factors a district court should consider in determining whether a class action settlement satisfies Rule 23. *Synfuel*, 463 F.3d at 653. All of these factors when considered in this litigation strongly weigh in favor of approval of the proposed settlement. Although the parties have conducted limited discovery for the purpose of evaluating settlement, they would need to engage in significant additional discovery of HSBC's 344,351,123 call records currently in the possession of Capital One. Like other consumer class actions that have proceeded to discovery, this would likely require each side to retain experts to analyze the mountains of data. There would be significant motion practice, and any judgment in favor of Plaintiffs would be further delayed by any appeal taken from the entry of a final judgment.

**C. Scant Opposition to Settlement**

The Seventh Circuit has held that the amount of opposition to a settlement among affected parties is yet another factor district courts should consider in deciding whether to approve a class action settlement. *Synfuel*, 463 F.3d at 653. Only 27 class members have requested to be excluded from the settlement, representing approximately 0.0003% of all class members. (Dkt. No. 95 at 14:21.) Of the approximately 9 million class members, the court has received 9 timely objections to the Settlement Agreement and only 5 of those objections take issue with the value of the settlement. Such a low percentage of opposition favors a finding that the settlement is fair, reasonable, and adequate under Rule 23. *See, e.g.*, *AT&T Mobility*, 789 F. Supp. 2d at 965 (citations omitted) (finding opt-out or objection by 0.01% of class members was "remarkably low" and supported the settlement).

### D.  The Experience and Views of Counsel

Under *Synfuel*, the opinion of competent counsel is relevant to determining whether a class action settlement is fair, reasonable, and adequate under Rule 23. *Synfuel*, 463 F.3d at 653. The court accepts that Class Counsel in this case are experienced litigators, especially in the TCPA context, and that they strongly support the settlement. (Dkt. No. 81 at 19-20.) Even though Class Counsel may be considered biased because they stand to benefit from approval, under *Synfuel*, this factor weighs in favor of approval.

### E.  Stage of the Proceedings and the Amount of Discovery Completed

The final factor the court is to consider under *Synfuel* concerns the stage of the proceedings and the amount of discovery completed at the time of the settlement. *Synfuel*, 463 F.3d at 653. The parties in this case engaged in minimal motion practice and their discovery efforts were confined to "confirmatory" discovery conducted after the parties reached an agreement in principle. On the other hand, in the *Mills* action originally filed in the Northern District of California, the parties conducted additional discovery and purportedly prepared briefs on the issue of class certification, although they agreed to mediate the case before filing those briefs. (Dkt. No. 81 at 20.) Moreover, because the outcome of this case would turn largely on the court's construction of the term "prior express consent" under the TCPA, the court is not convinced that extensive formal discovery, when measured against the significant cost that would be incurred, would place the parties in a proportionally better position than they are now to determine an appropriate settlement value of this litigation. The court therefore finds that the parties have completed a sufficient amount of discovery to be able to value their respective positions in this case. The final *Synfuel* factor weighs in favor of settlement.

### F. Objections Presented Are Not Well Founded Under the Applicable Law

For the reasons explained above, the factors set out by the Seventh Circuit in *Synfuel* support approving the Settlement Agreement in this case. Notwithstanding the court's conclusion that the Settlement Agreement is fair, reasonable, and adequate under Rule 23, there are 9 class members who have filed timely objections, although only 5 objectors take issue with the amount of the settlement. (Dkt. Nos. 70, 72, 73, 76-1, 83 Ex. A.) These objections collectively state three arguments the court will discuss briefly below.

First, five objectors urge the court to reject the settlement because it does not compensate class members based on the number of calls each class member received. The court inquired with counsel in this case and counsel in *Capital One* regarding the possibility of a call-based claims process. In both cases, however, counsel for all parties advised the court that a per call claim process would be extremely costly to administer for a class of 9 million people, or in the case of *Capital One* 17 million people. Indeed, a per call claim process might wipe out the costs saved by foregoing discovery of each class member's call history. The court therefore agrees with Class Counsel and HSBC that a call-based claims process is inadvisable, particularly because the increased administration costs would result in a corresponding decrease in the money available to the class.

Second, two class members have objected to the process by which Class Counsel and GCG provided notice of the pending settlement. Objector Dawn Weaver complains that the settlement website, www.wilkinstcpasettlement.com, was misleading because it did not include HSBC's company name. (Dkt. No. 75 at 2.) The court agrees that the settlement website could have had a clearer name, but the purposeful omission of HSBC from the URL is not a reason to scuttle the settlement given that more than 79% of class members received direct notice through email or U.S. mail. Objector Erich Neumann complains that the Notice published on the website

directs would-be objectors to mail a letter to the court and to the "attorneys listed on the Settlement Website," but does not provide contact information for either the court or the attorneys. (Dkt. No. 76-1 at 2.) As an initial matter, Neumann incorrectly quotes the notice. It directs would-be objectors to mail their objections to the "attorneys listed below," and not surprisingly provides contact information for Class Counsel and HSBC's counsel. *See* Notice at 5, available at wilkinstcpasettlement.com/-docs/notice.pdf (last visited Feb. 25, 2015 at 10:49 a.m.).[3] Neumann is correct that the Notice omits the address of this court in the section concerning objections, but the Notice provides the court's address in a later section on the same page. *Id.* The court is confident that nearly every class member viewing the Notice could easily locate the court's address and therefore rejects Neumann's objection to the notice process as well.

Finally, objector Laura Fortman argues that the release envisioned by the Settlement Agreement is overbroad because it prohibits class members from making any claim based on the unlawful collection of debts, while reserving HSBC's right to continue to collect on debts owed by class members. (Dkt. No. 72 at 9-11.) Fortman's assertion is incorrect and falls apart upon a more exacting review of the full release, rather than the abridged version Fortman quoted in her objection. As Class Counsel noted in their response to Fortman's objection, the release is expressly limited to claims "that arise out of" HSBC's "use of an 'automatic telephone dialing system' or an 'artificial or prerecorded voice,'" to make the calls at issue in this case. (Dkt. No. 82 at 31 (citing Settlement Agreement § III.R.).) Accordingly, the Settlement Agreement does not, as Fortman argues, release claims against HSBC (or Capital One) for unlawful collection efforts arising from different or additional factual circumstances.

---

[3] The court has no reason to believe the Notice form has changed from the time Neumann viewed it for purposes of preparing his objection.

The court finds that none of the objections to the total amount of the settlement or its administration are well-founded and, for the reasons explained in detail above, the court grants the motion (Dkt. No. 79) for final approval of the class action Settlement Agreement.

## II. Attorneys' Fees

### A. Class Counsel's Requested Fees

Class Counsel in this case represent that they have spent 1,845.20 hours in professional time over a two-year period litigating and settling this case on a contingent fee basis. (Dkt. No. 90 at 2.) They seek for their efforts an award of attorneys' fees equal to 30% of the $39,975,000 settlement fund or $11,992,500. (Dkt. No. 68.) They do not seek additional payment or reimbursement for any of their expenses on top of the requested fee award.

Before evaluating the reasonableness of Class Counsel's fee request, however, the court must adjust the percentage fee sought by Class Counsel to comport with the Seventh Circuit's recent guidance concerning attorneys' fees in common fund cases. Specifically, the Seventh Circuit has instructed district courts that the "ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman* v. *RadioShack*, 768 F.3d 622, 630 (7th Cir. 2014). Administration costs, notice costs, and class representative service awards, although paid through the settlement fund, are not benefits to the class and thus not part of "what the class members received." *Id.; see also Pearson* v. *NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (extending holding in *Redman* to cash fund cases).

Here, after subtracting administration and notice costs of $1,270,339 and the service awards to Mills and Wilkins totaling $10,000, the total money available to distribute to the class and Class Counsel is $38,694,661. Class Counsel seeks $11,992,500 of that total, more than 30%.

**B. Class Counsel's Requested Fee of 30% of the Settlement Fund Exceeds the Market Rate**

In the Seventh Circuit, the district court's task when determining the appropriate class action attorneys' fee is "to estimate the contingent fee that the class would have negotiated with the class counsel at the outset had negotiations with clients having a real stake been feasible." *Trans Union Corp. Privacy Litig.*, 629 F.3d at 744 (citations omitted). The Seventh Circuit, however, has not expressed a preference for a particular method of determining that market fee. The market-mimicking approach is, as the Seventh Circuit acknowledged, "inherently conjectural." *Id.*; *see also Synthroid I*, 264 F.3d at 719 ("[I]t is indeed impossible to know *ex post* the outcome of a hypothetical bargain *ex ante*.") In *Synthroid I*, however, the Seventh Circuit explained that it is possible to learn about "similar bargains" and set forth three "guides" or "benchmarks" to help district courts estimate the market fee: (1) actual fee contracts between plaintiffs and their attorneys; (2) data from similar common fund cases where fees were privately negotiated; and (3) information from class-counsel auctions. *Synthroid I*, 264 F.3d at 719. At least two other judges presiding in this district, and one judge from another district employing the Seventh Circuit's market-mimicking approach, have applied these three benchmarks to determine *ex post* the market contingent fee. *See AT&T Mobility*, 792 F. Supp. 2d at 1033-1034; *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *10-13 (N.D. Ill. Dec. 9, 2009) (Gettleman, J.), *rev'd on other grounds*, 629 F.3d 741 (7th Cir. 2011); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 40-45 (D.N.H. 2006) (Smith, J.).

### 1. Market Rate for TCPA Class Actions

Earlier this month, this court, in another TCPA class litigation, described the application of the *Synthroid I* benchmarks in determining the market rate for attorneys' fees. *Capital One*, 2015 WL 605203, at **11-16. In *Capital One*, the court first determined that prospective TCPA class members, were they to negotiate attorneys' fees *ex ante*, would negotiate a fee arrangement

based on a percentage of the recovery, rather than a lodestar-based compensation scheme. *Id.* at *10. The court then found that the data available on past awards in TCPA cases and other class actions showed that the mean and median fee for large TCPA class actions were between 20% and 24% of the settlement fund. *Id.* at **11-12, 15. The court further determined, based on fee arrangements actually negotiated in other cases and TCPA counsel's tendency to devote the bulk of their efforts to establishing liability, that an *ex ante* negotiation between class counsel and prospective TCPA class members would yield a downward scaling fee arrangement. *Id.* at **13-15. The court, having made the foregoing determinations, estimated a downward scaling fee agreement for TCPA class actions based in part on the fee schedule estimated by the Seventh Circuit in *In re Synthroid Marketing Litigation*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*"). The court's estimated market fee scale for large TCPA class litigation, before adjusting for the risks particular to the *Capital One* case, is reproduced in the table below.

| TCPA Market Rate Fee Scale | |
|---|---|
| **Recovery** | **Fee Percentage** |
| First $10 million | 30% |
| Next $10 million | 25% |
| $20 – 45 million | 20% |
| Excess above $45 million | 15% |

*Capital One*, 2015 WL 605203, at *16.

### 2. Application of TCPA Market Rate Fee Scale to This Case

Mills originally filed his class action against HSBC in the Northern District of California in 2012, the same year two of the three class actions were filed in the *Capital One* case. The third was filed in 2011.

This class action against HSBC involves 9 million class members whereas *Capital One* involved a class of 17 million. Both cases, however, may be characterized as large-scale TCPA class actions. Each had the potential to produce a recovery in the tens of millions of dollars. In light of the similarities between the *Capital One* case and this HSBC case, the court finds that the TCPA market rate fee scale the court recently estimated in *Capital One* applies with equal force here. In other words, the court finds that had negotiations between Plaintiffs and Class Counsel at the outset of the case been feasible, the parties would have negotiated a fee arrangement in line with the one the court estimated in *Capital One*. Applying the *Capital One* structure to this case, as set forth in the table below, yields Class Counsel a 23.75% fee before accounting for the risks inherent to this particular case.

| Application of TCPA Market Fee Scale to HSBC Settlement | | |
| --- | --- | --- |
| **Recovery** | **Fee Percentage** | **Fee** |
| First $10 million | 30% | $3,000,000 |
| Next $10 million | 25% | $2,500,000 |
| $20 – 45 million ($19,975,000) | 20% | $3,995,000 |
| Excess above $45 million | 15% | NA |
| **Total Fee** | **23.75%** | **$9,495,000** |

Although the 23.75% fee estimated above exceeds the 19.97% fee estimated using the same structure in *Capital One*, 2015 WL 605203, at *16, such is the nature of a downward scaling fee structure. Class counsel recover the principle costs of the litigation and any compensation for enhanced risk in the first recovery tier, while the class gets a larger share of the benefit at the margin. *See Silverman*, 739 F.3d 956, 959 (7th Cir. 2013) (discussing the mechanics of a scaled fee structure). As the recovery increases, the marginal rates diminish but counsel's total fee increases, preserving an incentive for counsel to seek a higher award for the

class. Here, in this HSBC case, Class Counsel are recovering a lower award than they did in *Capital One* and consequently are receiving a larger share of the common fund, but a lower actual fee. The 23.75% fee estimated here is consistent with the court's finding in *Capital One* that the mean and median fee for TCPA cases producing a large recovery are between 20% and 24% of the settlement fund.[4] *Capital One*, 2015 WL 605203, at *15.

### 3. Risk of the Litigation

The last factor the Seventh Circuit instructs a district court to consider is the risk plaintiffs' lawyers face of possibly losing the litigation when they undertake class representation. The estimated magnitude of the risk necessarily affects the price at which Class Counsel in this case would have been willing to offer their services in an *ex ante* negotiation, had such a negotiation occurred. *See Synthroid I*, 264 F.3d at 721. The Seventh Circuit has explained the risk premium in fee negotiations with the following hypothetical: "[I]f the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent change of a favorable outcome should be $2 million." *Trans Union*, 629 F.3d at 746 (citations omitted).

In *Capital One*, this court endeavored to comply with the Seventh Circuit's instruction that district courts should attempt to quantify the level of risk in a case, notwithstanding the challenges inherent in doing so after the case has settled. The court in *Capital One* determined, based upon the analysis of Professor Todd Henderson, that the average TCPA case carried a 43%

---

[4] Although the court's finding in *Capital One* applied to a $75.5 million recovery, the data underlying the court's analysis produce the same result for a settlement of $40 million. *See Capital One*, 2015 WL 605203, at **12-13 (summarizing the TCPA class data submitted by the parties in this case at Dkt. No. 109 and the analyses set forth in Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 248 (2010) and Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811 (2010)).

chance of success and the court used that benchmark as a starting point to assess the riskiness of the case. *Capital One*, 2015 WL 605203, at *17. In *Capital One*, the court found that class members' consent issues, the Rule 23 manageability concerns, and the possibility of future adverse FCC rulings made the representation riskier than a typical TCPA case, but only slightly so after considering the strong incentives to settlement created by the magnitude of Capitol One's potential liability. *Id.* at *17. The court in *Capital One* therefore applied a 6% risk premium to the first band of the *Capital One* fee structure, which the court determined using Eisenberg and Miller's finding that "high risk" consumer class actions yield a percentage fee premium of about 6% above the "low or medium risk" cases. *Id.* at *17 (citing 7 J. Empirical Legal Studies at 265 (Tab. 8)).

The court declines to apply the same percentage risk premium in this case. Plaintiffs here faced many of the same impediments to establishing HSBC's liability: the class members' alleged consent to receive automated phone calls; Rule 23 manageability issues; and potentially forthcoming FCC orders. But the *Wilkins* action was not filed until early 2014. Class Counsel has by their own admission "been at the forefront" of TCPA litigation. (Dkt. No. 83 at ¶ 3.) By 2014, therefore, Class Counsel knew or should have known that the incentives to settlement, at least for large financial institutions that made millions of phone calls in alleged violation of the TCPA, would most likely overcome any incentives to litigate. The court does not intend to imply that success in the *Wilkins* action was guaranteed; merely that settlement was more likely than not, and more likely than when Class Counsel agreed to represent the classes in the *Mills* action or in the *Capital One* case. The court further notes that, unlike *Capital One*, HSBC has not articulated the specifics of its "prior express consent" argument; it has merely asserted in a three-page brief that it believes most class members consented to be called. (Dkt. No. 64 at 1-2.) The court therefore cannot accord HSBC's consent defense the same weight it did Capital One's.

All told, this case is an average TCPA class action. There are serious obstacles for Plaintiffs to overcome in establishing liability, but they are the typical obstacles faced by most TCPA plaintiffs. The leverage here derives primarily from the magnitude of HSBC's potential liability. The court in this case, unlike the *Capital One* case, declines to adjust its market fee scale up or down to account for an enhanced or reduced level of risk. Using the TCPA market fee scale the court set out in *Capitol One*, which the court determined after its application of the *Synthroid I* benchmarks, the court concludes that the tiered fee arrangement displayed above approximates the agreed-upon percentage of the attorneys' fees to be taken from settlement, had Class Counsel negotiated with capable, sophisticated class members having a real stake in the litigation. The tiered fee arrangement produces a blended percentage fee of 23.75% of the $39,975,000 settlement or 24.54% of the $38,694,661 available to the class after subtracting administrative costs and service awards. Because both percentages are reasonable, the court grants Class Counsel the $9,495,000 in fees and costs that result from the court's estimated TCPA market fee scale.

The court further grants Class Counsel's requested incentive awards for Mills and Wilkins in the amount of $5,000 each. Incentive payments sufficient to induce class representatives to participate in the lawsuit are appropriate in the Seventh Circuit and, given the circumstances in this case, were necessary. *Continental*, 962 F.2d at 571. Moreover, a $5,000 award is consistent with the awards granted by other courts in this district and by this court in similar litigation. *See Capital One*, 2015 WL 605203, at *19; *AT&T Mobility*, 792 F. Supp. 2d at 1041 (collecting cases).

The Settlement Agreement states that HSBC's contributions to the settlement fund are non-reversionary, (Settlement Agreement § III.C), and that the court's approval of Class Counsel's desired attorneys' fees and costs are "not . . . a condition of settlement." (*Id.* § III.I.)

For the avoidance of doubt, the court orders that the additional money available as a result of the reduction of Class Counsel's requested fees and costs should go to the class members who made timely claims. After incorporating the court's reduced fee award, the money available to the class is $29,199,661, resulting in a payment to each timely claimant of at least $101.94, and possibly more if the threshold number of claimants fail to deposit their settlement checks within 180 days.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for final approval of the class action settlement [79] is granted. The settlement is fair, reasonable, and adequate. Class Counsel's motion for approval of attorneys' fees [68] is granted in part and denied in part. The court awards attorneys' fees and costs in the total amount of $9,495,000 (approximately 23.75% of the $39,975,000 settlement amount) and incentive awards of $5,000 to each of the two class representatives. The court requests that counsel for the parties submit to Judge Holderman's proposed order email address, proposed_order_holderman@ilnd.uscourts.gov, an agreed proposed order effectuating the parties' Settlement Agreement consistent with this Memorandum Opinion and Order and dismissing the case with prejudice pursuant to the settlement. Counsel should submit their joint proposed order on or before March 9, 2015.


ENTER:


JAMES F. HOLDERMAN
District Judge, United States District Court


Date: February 27, 2015